UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BEVERLY AHNERT Individually and as Executrix
of the Estate of Daniel Ahnert, Deceased,

        Plaintiff,

        v.                           Case No. 13-C-1456

EMPLOYERS INSURANCE COMPANY OF WAUSAU,
FOSTER WHEELER LLC,
PABST BREWING COMPANY,
SPRINKMANN SONS CORPORATION,
WISCONSIN ELECTRIC POWER COMPANY,

        Defendants.

---

ORDER GRANTING FOSTER WHEELER'S MOTION FOR SUMMARY JUDGMENT
(DOC. 130) AND DISMISSING CASE AGAINST FOSTER WHEELER

On February 25, 2010, Daniel Ahnert, a former member of Steamfitters 601 in Milwaukee, filed a lawsuit in the Eastern District of Wisconsin against Foster Wheeler and seventeen other defendants alleging that "from approximately 1957 to 1980" Ahnert was "exposed to and inhaled airborne asbestos fibers" resulting in "asbestos disease and injury." (Case No. 10-C-156, Doc. 1.) Soon after the case was transferred to MDL-875 in the Eastern District of Pennsylvania, Ahnert was diagnosed with mesothelioma. On January 10, 2011, Ahnert filed a second suit in Milwaukee County Circuit Court based on the mesothelioma diagnosis, again naming Foster Wheeler as a defendant. *Daniel Ahnert et al. v. Allied Insulation Supply Co., Inc., et al.*, Case No. 2011-CV-551. Daniel Ahnert died on July 7, 2011, and his wife, Beverly Ahnert (hereinafter "plaintiff"), was appointed executrix of the estate. Plaintiff decided to dismiss the Milwaukee County Circuit Court case on December 20, 2011; however, she waited until May 2, 2014, to file a motion for

leave to amend her MDL complaint to add the mesothelioma claim. The MDL court denied her request on May 22, 2014, on the ground that Beverly Ahnert had waited three years to move to amend the complaint and did so after discovery had closed and summary judgment motions were briefed. (Case No. 10-CV-67443 (E.D. Pa.), Doc. 406.) Meanwhile, on December 30, 2013, plaintiff filed a third lawsuit in this district, naming many of the same defendants. Again, she alleges that Daniel Ahnert "suffered from asbestos related diseases . . . including without limitation asbestosis." Now, however, she includes the malignant mesothelioma diagnosis from January 4, 2011. (Doc. 1 at 23). On September 8, 2014, the MDL transferred the first case back to the Eastern District of Wisconsin, where it is pending before Judge Pamela Pepper with similar summary judgment motions filed by Sprinkman Sons, Pabst Brewing, Wisconsin Electric Power Company, and Foster Wheeler.

On November 9, 2015, and December 10, 2015, oral argument was heard on the six summary judgment motions pending before this court. The parties were advised to respond candidly and completely about arguments made before the various courts and the dates on which discovery was requested and/or responses were filed. At the outset of the hearing, the court asked plaintiff's counsel to identify the date and nature of each exposure underlying plaintiff's claims with respect to each defendant. Foster Wheeler's potential liability arises from alleged exposure in 1989 when Daniel Ahnert worked on Unit 5 of the Oak Creek Power Plant. However, plaintiff does not assert that Foster Wheeler was involved in the work in 1989 as an employer, supplier, or manufacturer. Instead, Foster Wheeler has been named as a defendant because it installed the Unit 5 boiler system thirty years before the exposure in 1989.

2

As will be discussed in more detail below, much of the five-hour oral argument on November 9, 2015, focused on evidence that the plaintiff first produced in opposition to summary judgment and/or after discovery closed. The court excluded the June 17, 2015, declaration of Jon Shorougian, and ordered the plaintiff to disclose all of Ahnert's social security records. In turn, plaintiff agreed to redact the name of Foster Wheeler from those records that were disclosed after the discovery period ended, and stipulated to the dismissal of defendants L&S insulation Company Inc. and Building Services Industrial Supply, Inc. Based on the admissions of plaintiff's counsel and upon careful consideration of the evidence in the record, Foster Wheeler's motion for summary judgment will be granted.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court's ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

The Seventh Circuit has long recognized that summary judgment would be meaningless "if litigants could manufacture genuine issues of material fact through

3

Case 2:13-cv-01456-PP    Filed 01/05/16    Page 3 of 20    Document 198

self-serving and unsupported 'admissions' materially different from positions taken in the past." *U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005). For this reason, courts do not countenance the use of "sham affidavits," which contradict prior sworn testimony, to defeat summary judgment. *See, e.g., Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions . . . . If such contradictions were permitted . . . 'the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut.'") (internal citations omitted) (collecting authority). The rule against submitting affidavits that contradict prior depositions applies to prior statements under oath by parties and witnesses. *Id.*

At the same time, the court applies the rule with caution, mindful of the jury's role in resolving issues of credibility. *Id.* A contradictory affidavit may be allowed when it is used to clarify ambiguous or confusing testimony, or when it is based on newly discovered evidence. *Id.* at 1171-1172 (1996). Such an affidavit or declaration may also be considered where evidence is offered to show that the prior statement "was mistaken, perhaps because the question was phrased in a confusing manner or because lapse of memory is in the circumstances a plausible explanation for the disparity." *Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 756 (1998).

## BACKGROUND

The court scheduled oral argument after it became apparent during consideration of the proposed findings of fact that significant portions of the plaintiff's evidence surfaced for the first time with its submissions in opposition to Foster Wheeler's motion for summary judgment. Indeed, in an attempt to create a genuine issue of material fact, plaintiff filed a declaration—prepared after the filing of Foster Wheeler's motion for summary judgment—that contradicted the same witness's prior deposition testimony. In addition, plaintiff filed "new" social security records regarding Daniel Ahnert that were not requested or produced in a timely manner.

Notably, the declaration of Jon Shorougian dated June 17, 2015, was first disclosed on June 29, 2015, in response to Foster Wheeler's summary judgment motion. Shorougian was deposed in the MDL on March 27, 2012. In the case at bar, plaintiff was required to amend her pleadings by July 15, 2014, and discovery closed on February 27, 2015. Although plaintiff maintains that Shorougian's declaration was simply an attempt to "correct and clarify" statements made during the deposition, Shorougian contradicts his prior deposition testimony. Shorougian's declaration changes the date of Ahnert's last asbestos exposure from 1980 to 1989, changes the name of Ahnert's employer from Foster Wheeler to Babcock & Wilcox, and changes the time period during which Shorougian worked with Ahnert from "early 1980s" to 1989.

During oral argument, plaintiff conceded that, by December 4, 2012 (at the very latest), plaintiff knew of a document in Beverly Ahnert's possession that contradicted the dates mentioned by Shorougian in his deposition and that there was evidence that the plaintiff would rely upon in support of her claim of exposure at the Oak Creek Power Plant.

5

By choosing not to disclose the Shorougian declaration until after discovery had closed, plaintiff deprived Foster Wheeler of the opportunity to challenge Shorougian's recollection and candor respecting the matters discussed in his affidavit and/or his earlier deposition testimony. Moreover, Foster Wheeler made specific requests through interrogatories regarding the nature of plaintiff's claim but plaintiff only produced the Shorougian deposition. It was clear from the evidence disclosed that plaintiff believed Ahnert to be an employee of Foster Wheeler at the time of the exposure in the 1980s and that Foster Wheeler controlled and supervised its employees at the site. For these reasons, the court is excluding the Shorougian declaration from consideration as a sham.

The court also addressed Ahnert's "new" social security records that were never produced to Foster Wheeler, which state on the front that they may be incomplete because of the time required to process the records. In her surreply, plaintiff claimed that she disclosed the pre-1980 social security records in the MDL non-malignant case as an exhibit to motions for summary judgment. However, those records, attached as Exhibit 5 to the consolidated response in opposition to motions for summary judgment in MDL 875, were dated 1955-1980. The post-1980 records were not received until March 28, 2015, after the close of discovery. Plaintiff admitted that these "new" records were not requested until a later date and that the Social Security Administration takes six months to process its records typically. In any event, plaintiff's counsel stipulated during oral argument that he would not use the records to show that Foster Wheeler was Ahnert's employer during the alleged exposures.

Regardless of the court's concerns about the evidence that was never produced during discovery, consideration of the Shorougian declaration does not affect the court's

6

application of Wisconsin's construction statute of repose inasmuch as plaintiff does not contend that Foster Wheeler employed Daniel Ahnert at the time of the alleged exposure. The following findings of fact incorporate the submissions of both parties to the extent they are properly supported by citations to the record as required by Civil Local Rule 56(b)(2)(B)(ii).

FINDINGS OF FACT

Daniel Ahnert was a Steamfitter and a member of Steamfitters 601 in Milwaukee, Wisconsin. (Pl.'s Ex. 1 at 16.) In 2009, he was diagnosed with asbestosis, and subsequently died on July 7, 2011. (Pl.'s Ex. 2 at 6.) Dr. Stephen Haber determined Ahnert developed asbestos-related pleural disease from his occupational exposure to asbestos. (*Id.*) Dr. Haber also determined that Ahnert was diagnosed with malignant mesothelioma in December of 2010 and opined that malignant mesothelioma was the cause of Ahnert's death. (*Id.*) Ahnert's death certificate lists malignant mesothelioma as the primary cause of death. (Pl.'s Ex. 3.) Based on Ahnert's work history, Dr. Haber concluded that Ahnert's cumulative asbestos exposure, from any and all products, contributed to his asbestos disease. (Pl.'s Ex. 2 at 5-6.)

For purposes of summary judgment, Ahnert has focused on a boiler 100 feet tall and 50x50 across manufactured by Foster Wheeler in approximately 1958 that became operational in approximately 1959. (Pl.'s Ex. 12, pp. 24; Pl.'s Ex. 10 at 6-7; Pl.'s Ex. 17.)[1]

---

[1] Notably, the pending complaint does not assert that Foster Wheeler manufactured or produced any asbestos material; instead, it asserts that the company "designed, manufactured, and/or sold steam generation equipment, including without limitation boilers, erected steam generation equipment, sold asbestos containing products, and installed asbestos containing products. (Compl. 8, Ex. A to Celba Aff.)

7

Foster Wheeler and WEPCO were parties to multiple contracts and provided services relating to engineering, design, construction, and furnishing of materials for Oak Creek Unit 5. (Pl.'s Exs. 17-19, subparts of Ex. 19 listed as 1-3.) These documents, which Foster Wheeler prepared or executed, include : (1) Contract 7519 "Boiler" (relating to the supply of the parts and materials (Pl.'s Ex. 17); (2) Contract 7629 "Erection of A. Boiler and Appurtenances Furnished by Foster Wheeler Corporation and B. Miscellaneous Materials and Equipment Not Furnished By Foster Wheeler Corp." (Pl.'s Ex. 18); and (3) Oak Creek Unit 5 Insulation Requirements & Releases (Pl.'s Ex. 19 at 1-3.) According to the documents, Foster Wheeler prepared the insulation specifications for the entire unit's boiler system, supplied the boiler, and erected the boiler and appurtenant items for Unit 5 at the Oak Creek Power Plant (Pl.'s Exs. 17-19.) The "General Nature of the Work" as set forth in the 25, 1956 (rev. 31, 1958) contract stated:

> The work under Section A of this contract shall consist of complete erection in place, properly assembled, ready for operation, including initial unloading and reloading in storage areas, and re-unloading at job site, as necessary, of all tubes, pipes, headers, casing, ductwork, pulverizing equipment, air preheaters, as furnished by Foster Wheeler Corp. under contract 2-79-1960 dated 7/19/56 Rev. 12/7/56.

(Pl.'s Ex. 18 at 72.)

Enormous quantities of asbestos insulation were used on Unit 5. For example, about 43,000 square feet were required for the boiler on Unit 5. (Pl.'s Ex. 19 at WE56603011.) The superheater walls, roof and the piping and tubing leading to and from the superheater were insulated with asbestos containing insulation. (Pl.'s Ex. 20 at 65-66.) The rear walls of the superheaters were insulated with two layers of three inch thick asbestos blocks. The

reheater section was insulated with three to six inch thick layers of asbestos containing insulation. (Pl.'s Ex. 20 at 66.)

Foster Wheeler was not a signatory to WEPCO's insulation contracts for Unit 5 with Sprinkmann Sons Corporation at Oak Creek. However, as part of its contacts with WEPCO, Foster Wheeler determined the boiler refractory and insulation requirements, and wrote engineering specifications for use by the electric company, which were incorporated into WEPCO's insulation contracts. (Pl.'s Ex. 19 at WE56603025-3100.) Foster Wheeler was paid by WEPCO for the boiler refractory and insulation specifications. (Pl.'s Ex. 17 at 8, 50.) The engineering specifications provided by Foster Wheeler identified the type, trade name, manufacturer, thickness, and other requirements of the asbestos insulation to be purchased. (Pl.'s Ex. 19 at WE56603057- WE 56603069.) These specifications called for asbestos block insulation and asbestos cement (Pl.'s Ex.19 at WE 56603057-WE56604060, WE56603065, and WE 566030507- WE56603060.) Foster Wheeler was responsible, as erector of the unit, for supervision of the insulation contractor's work. (Pl.'s Ex. 22.)

An internal WEPCO memo dated June 23, 1960, addressed to the superintendent of power plant construction, found in the Oak Creek project files, states:

> We paid F.W. $4,125 for complete OC5 boiler refractory and insulation specifications and requirements. In addition to the fact that we were short-handed to do this work, we requested these specifications because F.W. insisted, in early discussions of boiler design, that all of their tube metal temperatures and heat loss calculations were based on certain refractory and insulation thicknesses and that the installation must be made accordingly. Although the refractory and insulation contacts were ours, supervision of this work was the responsibility of F.W.'s erector. Therefore, the responsibility of all refractory and insulation work on the boiler is F.W.'s. (Ex. 22 at WE56602030).

9

Units One through Eight of WEPCO's Oak Creek Power Plant went online between September 30, 1953 and October 31, 1967, and the plant was substantially completed by 1969. (*See* Energy Information Administration Inventory of Electric Utility Power Plants in the United States, 1999, p. 206, attached as Ex. F to Celba Aff.).

Thermal systems insulation (molded, block, cement/muds, mastics) installed on piping, boilers, turbines, and other large equipment contained at least 10-15% asbestos before the OSHA regulations were enacted in 1972. (Pl.'s Ex. 7 at 15-17; Ex. 6 at 5141-5162.) Gaskets in industrial settings were made from a range of 50 to 805 asbestos, and were in use from the 1940's into the 1980's. (Pl.'s Ex. 7, general report at 21-22.) Sheet packings that were used to make certain gaskets contain 30-50% asbestos. (Pl.'s Ex. 7, general report at 25.) James Herian, a former Wisconsin Electric Power Company (WEPCO) rigger who handled equipment for turbine outages, and William LaPointe, a former millwright with 30 years of experience working on turbine outages, confirmed that, before OSHA regulations were implemented, turbine insulation materials always contained asbestos. (Pl.'s Ex. 5 at 3, 5, 7; Pl.'s Ex. 9 at 9, 16.)

Jon Shorougian testified that he worked with Daniel Ahnert for approximately six months, "in the '80s, early to mid '80s at the Oak Creek Power Plant," on "unit No. 5 on the burner deck" of a Foster Wheeler boiler. (*See* Shorougian Dep., March 27, 2012, p. 6, lines 3-7, 8-9 and 19-21 attached as Ex. D to Celba Aff.) Ahnert was present for the tear down of the boiler unit in the 1980's. (Pl.'s Ex. 10 at 5-8.) He did a lot of "cutting, grinding, and welding." (Pl.'s Ex. 10 at 7, 8, 11, 13.) The workers became suspicious that the insulation they were tearing out contained asbestos, so they had the air-line insulation material and coal piping insulation material tested by the Union. (Pl.'s Ex. 10 at 12-13, 19.) The

10

insulation removal made the surrounding environment "very dusty." (Pl.'s Ex. 10 at 11.) Shorougian could see whiteish-grayish dust in the air. (Pl.'s Ex. 10 at 76.) For the entire six months that Ahnert worked on Unit 5 at Oak Creek, Ahnert breathed dust from the insulation. (*Id*.) In addition, there were gaskets on the boiler that Ahnert worked on. (Pl.'s Ex. 10 at 14-15, 74.) After they were removed, Ahnert used a scraper or power grinder with a wire wheel to clean the faces of the gaskets. (Pl.'s Ex. 10 at 14-15, 74.) Ahnert removed approximately 16 gaskets from the Foster Wheeler boiler that were 8"x8" and took an hour to remove each one. (Pl.'s Ex. 10 at 14-15, 74.) Ahnert's nose was six to eight inches away from the gasket and he breathed the gasket dust. (Pl.'s Ex. 10 at 75.) When asked in his deposition, Shorougian testified that they were employed by Foster Wheeler while performing the work on the Foster Wheeler boiler. (Shorougian Dep., March 27, 2012, p. 23, lines 8-11, and 19-24 attached as Ex. D to Celba Aff.).[2]

This case filed on December 30, 2013, names thirteen defendants, including Foster Wheeler. (Compl.) The complaint asserts that decedent, Daniel Ahnert, "from approximately 1955 to 1980, was exposed to and inhaled airborne asbestos fibers released while using or working in proximity to others using or removing such products." (Compl. ¶ 21.) It is alleged that the decedent suffered from asbestos-related diseases, including without limitation malignant mesothelioma diagnosed on January 4, 2011, and non-malignant asbestos conditions including without limitation asbestosis. (Compl. ¶ 23.)

---

[2]The court notes that in plaintiff's Response to Standard Interrogatories dated March 22, 2012, Exhibit C (Jobsite List) mentions only the following employers for Ahnert while at the Oak Creek Power Plant: Azco; Chicago Bridge; Foster Wheeler; National Valve; and Jungor Industrial. Babcock & Wilcox is not identified as one of Ahnert's employers on the Jobsite List. (Pl's Response to Standard Interrogatories 3/22/2012, Ex. C, attached as Ex. E to Celba Aff.).

CONCLUSIONS OF LAW

Foster Wheeler raises four arguments in support of its motion: (1) the Wisconsin Worker's Compensation Act provides plaintiffs exclusive remedy under Wis. Stat. § 102.03(2) that immunizes Foster Wheeler, as the employer, from the strict liability and negligence claims; (2) plaintiff is unable to show that Daniel Ahnert was exposed to or otherwise inhaled asbestos fibers from any product distributed, supplied or installed by Foster Wheeler; (3) the Wisconsin construction statute of repose, Wis. Stat. § 893.89, bars plaintiff's claims; and (4) the evidence fails to support plaintiff's punitive damages claim.

As an initial matter, the court dismissed plaintiff's punitive damages claim during the oral argument. Ahnert never addressed Foster Wheeler's arguments on this issue and the court found no basis in the record for concluding that Foster Wheeler acted maliciously toward Daniel Ahnert or in an intentional disregard of his rights. The claim must be dismissed. *See* Wis. Stat. § 895.043(4).

Next, the court turns to Foster Wheeler's argument that the Wisconsin Worker's Compensation Act contains an exclusive remedy provision banning all claims against an employer when liability exists under the Act. During the oral argument, plaintiff's counsel conceded that the only admissible evidence regarding employment in the 1980's was Shorougian's deposition testimony. Shorougian testified that Foster Wheeler was his employer and signed his paychecks. Wisconsin's Worker's Compensation Act, Wis. Stat. § 102.03(2), "expressly provides that the 'right to the recovery of compensation under this chapter shall be the exclusive remedy against the employer, any other employee of the same employer and the worker's compensation insurance carrier.'" *Martine v. Williams*, 2011 WI App 68, 333 Wis. 2d 203, 799 N.W.2d 449. Thus, to the extent that the admissible

12

evidence in the record establishes that Foster Wheeler was an employer and that Daniel Ahnert's disease causing injury arose out of that employment, the strict liability and negligence claims against Foster Wheeler must be dismissed.

That said, the parties have asserted alternative positions that the court will address at this time. During oral argument, plaintiff's counsel conceded that the Wisconsin Worker's Compensation Act was a major obstacle but, at the same time, proposed a stipulation that Babcock & Wilcox was Ahnert's employer in the 1980s. For purposes of summary judgment, plaintiff took the position that Foster Wheeler installed the boiler at the Oak Creek Power Plant in 1958 but never employed Ahnert during the time of the exposure. If that is correct, then the evidence, taken in the light most favorable to the nonmoving party, suggests that Wisconsin's construction statute of repose bars plaintiff's claims.

Wisconsin Statute § 893.89 precludes claims for injury brought more than ten years after the date of substantial completion of an improvement to property. *Kohn v. Darlington Comm. Sch.*, 2005 WI 99, ¶¶ 13–15, 283 Wis.2d 1, 698 N.W.2d 794. Because it is a statute of repose, it "provides that a cause of action must be commenced within a specified amount of time after the defendant's action which allegedly led to injury, regardless of whether the plaintiff has discovered the injury or wrongdoing." *Mair v. Trollhaugen Ski Resort*, 2006 WI 61, 291 Wis. 2d 132, 150, 715 N.W.2d 598, 607 (quoting *Tomczak v. Bailey*, 218 Wis.2d 245, 252, 578 N.W.2d 166 (1998)). In determining whether something qualifies as an improvement to real property the court applies the following test: "A permanent addition to or betterment of real property that enhances the capital value, involves the expenditure of labor and money, and is designed to make the property more

13

useful and valuable." *Id.* ¶ 17. However, there is an exception for claims brought against "[a]n owner or occupier of real property for damages resulting from negligence in the maintenance, operation or inspection of an improvement to real property." Wis. Stat. § 893.89(4)(c).

In opposition to summary judgment, plaintiff's brief asserts that there is a genuine issue of material fact as to whether the exposures were from maintenance or repair work rather than an improvement to real property. However, during oral argument, plaintiff's counsel conceded that the installation of the Oak Creek boiler in 1958 was an improvement.

Foster Wheeler agrees inasmuch as the Oak Creek Power Plant was a long-term WEPCO project requiring a large capital investment. "The power producing units, including the boilers, were constructed to enhance value, increase energy output, and generate greater profit." (Doc. 131 at 12.) The uncontroverted evidence establishes that, as permanent structures, the boilers could not be removed without significant effort or expense. Further, plaintiff produced no evidence to refute Foster Wheeler's evidence showing that its role in the 1959 installation was an improvement to real property. To the extent that plaintiff attempts to shift the focus to Ahnert's work at the time of his exposure in 1989, she simultaneously denies that Foster Wheeler employed Ahnert or was otherwise on site in 1989. Rather, plaintiff continues to argue that Foster Wheeler is liable because in 1958 it "determined the boiler refractory and insulation requirements, and wrote engineering specifications for use by the electric company, which were incorporated into WEPCO's insulation contracts" at the time of the installation. (Doc. 150 at 7.)

The court is mindful that the purpose of the statute of repose is to protect contractors who are involved in permanent improvements to real property. *Peter v. Sprinkmann Sons*

14

*Corp.*, 2015 WI App 17, ¶ 23, 360 Wis. 2d 411, 860 N.W.2d 308. The legislature has chosen to protect persons or entities which make permanent improvements to real property, not to absolve those who make regular repairs or do maintenance work. *Id.* This distinction is reasonable because improvements to real property have a completion date whereas regular repairs and maintenance can continue ad infinitum. *Id., citing Kohn*, 2005 WI 99, ¶ 71.

For example, in *Kohn,* a four-year-old child was injured after she fell through the bleachers during a football game thirty years after the bleachers were installed. 2005 WI 99, ¶ 33. In holding that the bleachers constituted an improvement to real property within the meaning of Wis. Stat. § 893.89 at the time of installation, the Wisconsin Supreme Court commented that the bleachers were a permanent addition that enhanced the capital value of the property, while involving an expenditure of labor or money designed to make the property more useful or valuable. *Id.* Specifically, the bleachers were a huge structure, 15 rows tall, over 100 feet long and could seat 1500 individuals. That they could be disassembled was not dispositive because the bleachers, like the Unit 5 boiler, required a significant amount of time and effort to disassemble and remove.

Similarly, in *Peter* the Wisconsin Court of Appeals agreed that the "initial installation of insulation into a building or house may be considered an improvement to real property." Notably, the plaintiff in *Peter* was not claiming exposure to asbestos from the original installation but rather contended that the injury occurred during daily exposure when the defendant's employee performed regular maintenance and worked around the pipes. 2015 WI App 17, ¶ 24. It was the defendant's act of disturbing the insulation during the

15

subsequent maintenance and repair activities that precluded summary judgment in *Peter. Id.*

The Foster Wheeler boiler, like the bleachers in *Kohn,* remained at the site for over thirty years after installation. The boiler was approximately 100 feet tall and 50x50 across. Pursuant to the language in the contract filed by plaintiff, Foster Wheeler prepared the insulation specifications for the entire boiler's system and supplied and erected the boiler for Unit 5 at Oak Creek.[3] Forty-three thousand square feet were required for the boiler alone. There is no evidence that Foster Wheeler had any other involvement with the Unit 5 boiler. Ahnert assisted in tearing down the boiler thirty years after Foster Wheeler's involvement. By plaintiff's account the installation of the boiler required tremendous time and space, and the tear down was not a simple task.

Hence, on this record, the court concludes, as a matter of law, that Foster Wheeler's involvement with the installation of the Unit 5 boiler was an improvement to real property within the meaning of Wis. Stat. § 893.89, designed to increase profits and the efficiency of the Oak Creek Power Plant and required a significant capital investment. Accordingly, plaintiff had ten years from the date of installation to bring suit and the claims are now time barred.

In its brief, plaintiff made a confusing argument that Foster Wheeler was a manufacturer or producer of turbine insulation material; however there is no evidence to support such assertion. (Doc. 150 at 20.) Plaintiff concedes that Foster Wheeler was

---

[3] During the December 10, 2015, oral argument, plaintiff attempted to rely upon evidence filed by WEPCO in support of summary judgment. However, plaintiff never made that argument in opposing summary judgment and never cited to or otherwise filed the 1988 WEPCO contract with Babcock & Wilcox. Moreover, that evidence is irrelevant to this court's analysis.

16

neither a manufacturer nor producer of any product. Foster Wheeler provided the specifications for the installation of the boiler. The statute does not exempt those who provided specifications for the "manufacture" or "production" of the boiler installation, particularly those who are sued approximately 30 years prior to the alleged exposure.

Alternatively, plaintiff has argued that if Foster Wheeler is not the manufacturer of the insulation, the statute of repose is still not available because the insulation material are standard items which were defective before construction. The statute limits actions against any person involved in the improvement to real property to recover damages "arising out of any deficiency or defect in the design, land surveying, planning, supervision or observation of construction of, the construction of, or the furnishing of materials for, the improvement to real property." Wis. Stat. § 893.89(2). Notably, the only exceptions to the construction statute of repose are for (1) a person who commits fraud, concealment, or misrepresentation related to a deficiency or defect in the improvement to real property; (2) a person who expressly warrants or guarantees the improvement to real property, for the period of that warranty or guarantee; (3) an owner or occupier of real property for damages resulting from negligence in the maintenance, operation or inspection of an improvement to real property; and (4) damages that were sustained before April 29, 1994. However, construing the evidence in the light most favorable to the plaintiff, Foster Wheeler was involved in the design and/or construction of the boiler and cannot be liable for the furnishing of materials that it neither manufactured nor produced.

The Wisconsin Supreme Court has explained that the statue of repose protects "*all* who are involved in the actual improvement of real property *to the extent they participated in improving the property*." *Kohn*, 2015 WI 99, ¶ 68 (emphasis in the original). On the other

17

hand, the statute excludes material producers from protection when liability is based on the defective design or manufacture, which occurs prior to any involvement with the improvement. The Court reasoned that the "material is defective when it is designed or produced and remains defective regardless of the acts of third parties related to the improvement in which it is used." *Id.* at ¶ 72. The line is drawn between the materials producer that designs and/or produces defective material placed in the stream of commerce and the person who installs the improvement, which may be later modified by the owner or occupier. *Id.* at ¶¶ 75-77. Protection exists for the contractor who installed the improvement because that contractor has no right to insure that the work is properly inspected and maintained throughout the life of the improvement and may face liability for the conduct of others that occurred after the improvement was installed. *Id.*

Foster Wheeler manufactured boilers, not turbines or turbine insulation. There is no evidence that Foster Wheeler manufactured or produced the asbestos material that plaintiff contends was defective. Moreover, there is nothing in this record to suggest that Foster Wheeler had any control over the maintenance, repair, or removal of the asbestos-containing materials at any time after the installation. The statutory language does not affect the rights of a person injured "as the result of any defect in any material used in a improvement to real property to commence an action for damages against the manufacturer or producer of the material." Wis. Stat. § 893.89(2). Rather, the statute protects those companies like Foster Wheeler who provided the specifications for the installation and actually installed the new equipment. Because Foster Wheeler was not the manufacturer or producer of any asbestos products, the statute applies.

18

Finally, plaintiff has argued that Wis. Stat. § 893.89 is unconstitutional as applied if it bars claims for asbestos related conditions diagnosed after April 29, 1994, as the result of exposures and wrongful conduct that triggers an asbestos disease process before that date. Specifically, plaintiff cites Wis. Const. Art. 1, ¶ 9, which provides:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obligated to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

However, the Wisconsin Supreme Court rejected this argument in *Kohn*, reasoning as follows:

> A statute of repose "limits the time period within which an action may be brought based on date of the act or omission." Id., ¶ 26. A statute of repose may therefore bar an action before the injury is discovered or before the injury even occurs. *Id.* "[B]y definition, a statute of repose cuts off a right of action regardless of the time of accrual." *Tomczak v. Bailey*, 218 Wis.2d 245, 277, 578 N.W.2d 166 (1998)(emphasis added). As such, when the legislature enacts a statute of repose, it "expressly cho[o]se[s] not to recognize rights after the conclusion of the repose period[ ]." *Wenke v. Gehl*, 2004 WI 103, ¶ 24, 274 Wis.2d 220, 682 N.W.2d 405 (citing *Aicher*, 237 Wis.2d 99, ¶ 54, 613 N.W.2d 849). In other words, a statute of repose does not merely extinguish a party's remedy, it extinguishes the right of recovery altogether. Therefore, statutes of repose do not violate the right to remedy provision of Article I, Section 9 because any right of recovery is extinguished at the end of the repose period and the right for which the litigant seeks a remedy no longer exists. *Aicher*, 237 Wis.2d 99, ¶ 54, 613 N.W.2d 849.

2005 WI 99, ¶ 38. The Court declined to "second guess the policy choices the legislature made in enacting 893.89 under the guise of Art. I, Sect. 9 and definitively ruled that § 893.89 does not violate Article I, Section 9 of the Wisconsin Constitution. For the same reasons, the court rejects plaintiff's constitutional argument. Having found that the statute of repose applies,

IT IS ORDERED that Foster Wheeler's motion for summary judgment is granted.

19

IT IS FURTHER ORDERED that the case is dismissed as to Foster Wheeler.

Dated at Milwaukee, Wisconsin, this 5th day of January, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE