UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BEVERLY AHNERT Individually and as Executrix
of the Estate of Daniel Ahnert, Deceased,

        Plaintiff,

        v.                                  Case No. 13-C-1456

EMPLOYERS INSURANCE COMPANY OF WAUSAU,
PABST BREWING COMPANY,
SPRINKMANN SONS CORPORATION,
WISCONSIN ELECTRIC POWER COMPANY,

        Defendants.

---

ORDER DENYING EMPLOYERS INSURANCE OF WAUSAU AND SPRINKMANN SONS CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. 119)

    Sprinkmann Sons Corporation ("Sprinkmann") moves for summary judgment on plaintiff's negligence, strict product liability, and punitive damages claims. According to the complaint, Sprinkmann sold, installed and removed asbestos products and manufactured asbestos-containing products that caused Daniel Ahnert's asbestosis and malignant mesothelioma. Daniel Ahnert filed a lawsuit in this district in 2010 alleging that he had been disagnosed with non-malignant asbestosis caused by asbestos exposure. *Ahnert v. CBS Corp., et al.,* Case No. 10-156 (E.D. Wis.) Shortly thereafter, the Judicial Panel on Multidistrict Litigation transferred the case to the Eastern District of Pennsylvania, where it was consolidated for pretrial purposes as part of MDL 875. Case No. 10-67443 (E.D. Pa.) Rather than amending the complaint pending before the MDL court after being diagnosed with mesothelioma, Ahnert filed suit in Milwaukee County Circuit Court. *Daniel Ahnert et al. v. Allied Insulation Supply Co., Inc., et al.,* Case No. 2011-CV-551. Daniel

Ahnert died on July 7, 2011, and his wife, Beverly Ahnert (hereinafter "plaintiff"), was appointed executrix of the estate. She dismissed the Milwaukee County action and filed a third lawsuit in the Eastern District of Wisconsin, again alleging that Daniel Ahnert suffered from asbestos related diseases . . . including without limitation asbestosis." However, plaintiff now includes the malignant mesothelioma claim from January 4, 2011. (Case No. 13-1456, Doc. 1 at 23.)

Plaintiff sought leave to amend the complaint in the MDL four years after the MDL case was filed and three years after the mesothelioma diagnosis. Judge Eduardo C. Robreno of the MDL denied the motion on May 22, 2014, because discovery had closed and summary judgment motions were briefed. (Case No. 10-67443 (E.D. Pa.), Doc. 406.) In addition, Judge Robreno granted in part and denied in part Sprinkmann's motion for summary judgment. He found sufficient evidence of exposure to asbestos-containing insulation disturbed by Sprinkmann employees at the Oak Creek facility, but no such exposure in the Milwaukee Public Schools. Judge Robreno remanded the statute of repose issue to the transferor court, and severed the punitive damages claim. The remanded case has since been transferred to Judge Pamela Pepper, where Sprinkmann has filed a second motion for summary judgment on the issue of the statute of repose. Sprinkmann filed a similar motion in this case, and also alleges that there is no evidence of exposure to asbestos-containing products installed or supplied by Sprinkmann and no evidence supporting a punitive damages claim.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Where factual disputes do exist, the non-movant's version of events is accepted as true at this stage of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion; however, there must be a genuine issue of material fact for the cause of action to survive. *Id*. at 247–48, 106 S. Ct. 2505. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. The Supreme Court has explained that, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp.*, 477 U.S. at 323.

FINDINGS OF FACT[1]

Daniel Ahnert worked as a steamfitter out of Local 601 in Milwaukee from around 1955 to around 1992. (Pl.'s Ex. 1, ¶ 16.) Dr. Stephen Haber diagnosed Ahnert with asbestos-related pleural disease and attributed this condition to each of Ahnert's

---

[1] For purposes of summary judgment, this court did not include plaintiff's proposed findings of fact that were not supported by a citation to the record and/or other supporting materials as required by Civil Local Rule 56(b)(2)(B)(ii). In addition, the citations to the plaintiff's exhibits refer to the documents filed as ECF 148. The ECF exhibit numbers do not align with the exhibit labels on the documents; consequently, the court has cited to the exhibits on the documents as identified in the docketing text.

3

exposures to asbestos. (Pl's Ex. 2.) Daniel Ahnert was diagnosed with malignant mesothelioma in December of 2010 and passed away on July 7, 2011. (Pl.'s Ex. 2 at 6.) His death certificate states that malignant mesothelioma was the cause of death. (Pl.'s Ex. 3.) Daniel Ahnert's wife, BeverlyAhnert, is the duly appointed executrix of his estate. (*See* Compl., ¶ 2).

In her complaint, Beverly Ahnert asserts that Sprinkmann sold, installed, and removed asbestos products and manufactured asbestos-containing products. (*See* Compl., ¶ 15). She contends that, from approximately 1955 to 1980, Daniel Ahnert was exposed to and inhaled airborne asbestos fibers released while using or working in proximity to others using or removing such products. (Compl., ¶ 21). According to the complaint, Daniel Ahnert suffered from "asbestos related diseases, including without limitation malignant mesothelioma diagnosed on January 4, 2011, and non-malignant asbestos conditions, including without limitation asbestosis." (Compl., ¶ 23).

Although former co-worker John Burns testified regarding Daniel Ahnert's alleged exposure at Milwaukee Public School sites (*see* Burns Dep. at 50-52 attached as Ex. B to Rhoades Aff.), Sprinkmann has already been granted summary judgment with respect to Ahnert's claims of exposure at Milwaukee Public Schools. (*See* E.D. Pa Case No. 10-CV-67443, Doc. 410, attached as Ex. E to Rhoades Aff.). Plaintiff agrees that any claims based on exposure at Milwaukee Public Schools are barred. (Doc. 146, ¶ 11.) Moreover, plaintiff has abandoned her claim that Sprinkmann was responsible for any exposures after 1980. (Doc. 146, ¶ 19.)

On the other hand, Charles Lewitzke, a former ironworker, testified that he worked with Daniel Ahnert, a steamfitter, on an outage at the Oak Creek Power Plant "around '68,

4

'69" for "at least four months." (Pl.'s Ex. 4 at 11-14.)[2] The work was an overhaul of a General Electric fossil fuel turbine which required removal and reinstallation of insulation, including asbestos blankets, asbestos sheets, and asbestos pipecovering. (*Id.* at 14, 17-18, 20.) The work involved tearing down the turbine (taking off the entire top, removing the spindle, the pistols and rings), putting in "new bearings and so forth," "new rings and whatnot," and rebuilding it. (*Id.* at 12, 14, 15.) The turbine was already in place, but there were pipes that needed to be covered. (*Id.* at 17.) Insulation packages at the Oak Creek Power Plant outage were labeled with the word "asbestos" and the foreman and other workers used the word "asbestos" to describe the insulation. (*Id.* at 19-21.) Lewitzke was subsequently trained to identify insulation that contained asbestos and he relied on that training during his deposition to assess whether the insulation he remembered at Oak Creek and Port Washington contained asbestos. (*Id.* at 35-46.)

Ahnert's duties on the Oak Creek outage included covering pipes, which he performed on the turbine floor. (*Id.* at 15.) Ahnert stood approximately 20 feet from workers who were removing and installing insulation. (*Id.* at 17-18.) The outage, including all insulation work, was conducted in the ordinary manner for work during this period of time. (*Id.* at 19-23.) Insulation work created large quantities of dust for the entirety of the Oak Creek outage. (*Id.* at 17-19; Pl.'s Ex. 5, ¶ 11.) There were no safety procedures, such

---

[2]Sprinkmann challenged the deposition testimony of Lewitzke because plaintiff did not establish that his testimony was unavailable during the discovery period in the MDL proceeding and/or that plaintiff should be limited to the six-month period in 1989. However, Lewitzke was deposed in this litigation on July 8, 2014, before the discovery deadline of February 27, 2015. *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 244 (1999) and the doctrines of preclusion allow plaintiff to bring a second case to the extent that Sprinkmann was not granted summary judgment in the prior litigation on the asbestos claims or otherwise dismissed with prejudice and an expectation of finality. Accordingly, the court will consider Lewitzke's testimony.

5

as masks or instruction, which would have protected workers on the turbine job from the dangers of inhaling asbestos. (Pl.'s Ex. 4 at 19, 21-22.) On any WEPCO outage longer than four weeks, Sprinkmann was hired as a contractor to supply and install insulation. (Pl.'s Ex. 5, ¶¶ 9, 11.)

Between 1964 and 1965, Lewitzke worked with Daniel Ahnert at the Port Washington Power House, another WEPCO facility, on a turbine outage that lasted six-to-eight months during which time Ahnert covered pipes with insulation, cut pipes, and worked on the turbine floor. (Pl.'s Ex. 4 at 24, 27-28, 31.) However, Lewitzke did not know how long Daniel Ahnert was at Port Washington. (*Id.* at 28.) The Port Washington outage was to repair a damaged spindle fiber. (*Id.* at 27.) On the Port Washington outage, many types of insulation, including asbestos sheets, asbestos cement, and pipecovering, were removed and reinstalled. (*Id.* at 28-29, 33-35.) The labels of insulation packages included the word "asbestos." (*Id.* at 35.) The removal and reinstallation of turbine insulation on the Port Washington outage produced large quantities of dust. (*Id.* at 32.; Pl.'s Ex. 5, ¶ 11.) There were no safety precautions in place, such as wearing masks, to protect workers from the dangers of inhaling asbestos fibers. (Pl.'s Ex. 4 at 32-33, 36.) Lewitzke testified that the Port Washington outage involved an Allis-Chalmers turbine; however, CBS corporate designee Doug Ware identified a spindle replacement on a Westinghouse turbine at Port Washington about seven years later. (Pl.'s Ex. 5 at 27; Pl.'s Ex. 13 at 31-32; Pl.'s Ex. 14 at PTWAS 167-168.)

Lewitzke was unable to provide any information regarding the brand name of the material with which Ahnert worked. (*See* Lewitzke Dep. at 64-65, 68-69, 90, attached as

6

Ex. G to Rhoades Aff.) He testified that he had a general recollection that there was some sort of insulation and powder material that was mixed, but was unsure of the brand name of the insulation involved. (*See* Lewitzke Dep. at 55-56, attached as Ex. G to Rhoades Aff.) Lewitzke could not provide any testimony regarding the insulators that may have been at either of those two facilities. (*See* Lewitzke, Dep. at 42, attached as Ex. G to Rhoades Aff.)

Robert Wolter, a steamfitter with Local 601 in Milwaukee, worked with Daniel Ahnert at Pabst Brewery between 1955 and 1959 performing the same tasks in the same area.[3] Their work supported an effort to transfer between forty and fifty tanks from Schlitz to Pabst. (Pl.'s Ex. 17 at 10-11, 20-22; Pl.'s Ex. 16, ¶ 3.) Wolter worked alongside Daniel Ahnert on the tank transfer once or twice at each site for two to three weeks at a time. (Pl.'s Ex. 16, ¶ 2.) Ahnert did not wear a mask during his work on the tank transfer. (Pl.'s Ex. 17 at 74.) His duties on the tank transfer included disconnecting and reconnecting tank piping. (Pl.'s Ex. 16, ¶ 5.) For approximately 60% of Ahnert's work on the tank tansfer, insulators between 20 and 30 feet from him cut three foot-long pieces of pipe insulation, producing considerable amounts of airborne dust. (Pl.'s Ex. 16, ¶ 5; Pl.'s Ex. 17 at 21-26.) On the tank transfer, a brand of pipecovering called Kaylo was installed on tank piping.

---

[3] Sprinkmann objects to the use of Wolter's testimony. However, Wolter was disclosed in this litigation on June 13, 2013, and deposed on October 25, 2013, in the MDL litigation. In the MDL, plaintiff was required to identify each product, each defendant who was liable because of the product, the location, the date of exposure and all of the witnesses who would provide testimony regarding the defendant's liability regarding each product. Wolter's notice of deposition in the MDL stated he would provide testimony regarding Owens-Illinois and Pabst. Nevertheless, there were no requirements with respect to disclosures or designations in the litigation pending before this court and nothing prevented Sprinkmann from taking Wolter's deposition or reviewing the prior deposition prior to the end of discovery on February 27, 2015.

7

(Pl.'s Ex. 17 at 22-23; Ex. 16, ¶ 6.)  Pabst employees also worked on piping during Ahnert's work on the tank transfer.  (Pl.'s Ex. 17 at 28-9.)

Sprinkmann was the insulation contractor that worked at Pabst.  (Pl.'s Ex. 22 at 13-14; Pl.'s Ex. 21 at 18:3-9.)  When the tank transfer occurred, a Sprinkmann employee was stationed at Pabst on a full-time basis.  (Pl.'s Ex. 20 at 31:9-33:8, 43:4-7; Pl.'s Ex. 21 at 18:15-16; Pl.'s Ex. 17 at 973.)  Jack Wetzel, a Sprinkmann deliveryman, testified that Sprinkmann employees did insulation work at all of the Pabst buildings between 1955 and 1972.  (Pl.'s Ex. 19.)  Wetzel made about 75% of Sprinkmann's deliveries to Pabst.  Every three weeks he brought insulation materials, such as block insulation, pipecovering, and insulating cement, including One-Cote, Eagle "66," and Carey.  (Pl.'s Ex. 19.)  Kaylo, Carey, Eagle "66," and One-Cote are listed in the Federal Register as asbestos-containing products.  (Pl.'s Ex. 6 at 5156, 5145, 5146.)

Before OSHA regulations were enacted in 1972, insulation installed on boilers, turbines, and other thermal equipment contained 10-15% asbestos.  (Pl.'s Ex. 7 at general report at 15-17; Pl.'s Ex. 6.)  Between the 1940s and the 1980s, gaskets installed in industrial settings contained 50-80% asbestos.  (Pl.'s Ex. 7 at general report at 21-22.)  Sheet packing used to make gaskets contained 30-50% asbestos.  (Pl.'s Ex. 7 at general report at 25.)  Rope yarn packings contained 75-100% asbestos.  (Pl.'s Ex. 7 at general report at 25.)  At large powerhouses such as Oak Creek and Port Washington, the vast majority of pipecovering was not replaced during outages.  (Pl.'s Ex. 8, ¶ 9; Pl.'s Ex. 9, ¶¶ 32-33.)  Before OSHA regulations were implemented in 1972, insulation materials on high-heat sections of turbines always contained asbestos.  (Pl.'s Ex. 5, ¶¶ 3, 5, 7; Pl.'s Ex. 9, ¶¶ 9, 16.)

William Sprinkmann, Jr. testified that he presumed that his company did work "in maybe 35 states" as long as he had been involved in the company. (Pl.'s Ex. 50 at 7.) The Wisconsin Industrial Commission, which plays an important role in defining the health and safety responsibilities of Wisconsin employers, listed asbestos as a toxic substance in regulations dating back to 1947. (Pl.'s Ex. 66 at 4.) After revisions to its regulations in 1955, the Wisconsin Industrial Commission kept asbestos on its list of toxic substances. (Pl.'s Ex. 24 at 13.) In 1964, a study by Dr. Irving Selikoff regarding the health effects of asbestos was distributed to members of Insulators Local 19, which included many Sprinkmann employees.

Beginning in 1956, Sprinkmann employees filed workmen's compensation claims for asbestos-related diseases. (Pl.'s Ex. 51 at 1, 40, 48.) In the late 1960s and early 1970s, two members of the Sprinkmann family died from mesothelioma. (Pl.'s Ex. 52 at 3, 6.) Wetzel testified that he learned that asbestos was dangerous in the 1960s when he heard from Sprinkmann employees that the owner and his son had died of asbestos-related diseases. (Pl.'s Ex. 53 at 21-25.) After the OSHA regulations passed in 1972, Sprinkmann resolved to stop using asbestos, but continued to sell its remaining inventory of asbestos pipecovering. (Pl.'s Ex. 53 at 14-17.) In 1982, Sprinkmann's controller told a Sprinkmann employee to destroy 150 boxes of corporate records. (Pl.'s Ex. 54 at 24-27.)

Former GE and Westinghouse employee William LaPointe, prepared a declaration filed in opposition to summary judgment stating that the turbine outages at Oak Creek and Port Washington did not increase the turbine's capacity to generate electricity beyond its capacity at construction. (Pl.'s Ex. 9, ¶ 13.)

9

CONCLUSIONS OF LAW

Sprinkmann moves for summary judgment on three grounds: (1) there is no evidence that Daniel Ahnert was exposed to asbestos-containing products installed or supplied by Sprinkmann; (2) Wisconsin's construction statute of repose, Wis. Stat. § 893.89, bars plaintiff's claims; and (3) plaintiff's punitive damages claim must be dismissed because there is no evidence that Sprinkmann engaged in any malicious conduct or acted with intentional disregard to Daniel Ahnert's rights. Because the court has identified genuine issues of material fact, the motion will be denied and the claims again Sprinkmann will proceed to a jury trial.

The first issue is one of causation. In a products liability action, negligence and strict-products-liability claims require a plaintiff to prove that the alleged defect in the defendant's product was a cause of the plaintiff's injury or damages. *Morden v. Continental AG*, 2000 WI 51, ¶ 45, 235 Wis.2d 325, 611 N.W.2d 659 (negligence); *Zielinski v. A.P. Green Indus., Inc.*, 2003 WI App 85, ¶ 8, 263 Wis.2d 294, 661 N.W.2d 491 (strict-products-liability). When determining causation on summary judgment, a court must determine "whether the defendant's negligence was a substantial factor in contributing to the result." *Zielinski*, 263 Wis.2d 294, ¶ 16 (citation omitted). To be a "substantial factor," requires "that the defendant's conduct ha[ve] such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Id*. (citation and one set of quotation marks omitted). "A mere possibility of . . . causation is not enough; and when the matter remains one of pure speculation or

conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* (citation and quotation marks omitted).

The Wisconsin Court of Appeals in *Zielinski* reversed the trial court's denial of summary judgment after the trial court concluded that the evidence on summary judgment was "insufficient to establish that [George] Zielinski had been exposed to any asbestos-containing products supplied by Firebrick" while working for Ladish Company. *(See Id.*, ¶¶ 1, 4.) In ruling, the Wisconsin Court of Appeals relied on selected portions of a co-worker's deposition transcript suggesting that Zielinski had worked with him as a mason doing refractory work "maybe about four or five years." Further, another witness testified that Ladish had "probably bought" Weber 48 from Firebrick and, therefore, a fact-finder could infer that Zielinski used the product while working as a mason at Ladish. (*Id.*, ¶¶ 19-21.)

With respect to the outage at the Oak Creek Power Plant in the 1960s, Lewitzke testified that Ahnert worked on the job at least four months, covering pipes with insulation, cutting pipes, and working on the turbine floor. He also testified that Ahnert stood approximately 20 feet from workers who were removing and reinstalling insulation, and that asbestos blankets, sheets and pipe insulation were used on the outage. Lewitzke saw boxes labeled asbestos and relied upon his subsequent training to identify the materials. Additionally, he testified that the insulation work created large quantities of dust during the outage. According to Lewitzke, there were no safety instructions about asbestos or requirement to wear masks.

The evidence, taken in the light most favorable to the plaintiff, suggests that Sprinkmann performed insulation work on any turbine outage work lasting more than four

11

weeks at WEPCO, that the insulation contained asbestos, that the work created dust, and that Daniel Ahnert was working at the facility in proximity to the asbestos-containing products and without a mask at the relevant time period. There is sufficient evidence for a reasonable juror to infer that Sprinkmann caused Daniel Ahnert's exposure to asbestos at the Port Washington and Pabst sites. Lewitzke's testimony placed Ahnert at the Port Washington Power House between 1964 and 1965. It was Lewitzke's recollection that many types of insulations, including asbestos sheets, asbestos cement and pipecovering were removed and reinstalled. The packages were labeled with the word asbestos, and the work created dust. No safety precautions were taken, the steamfitters did not wear respiratory masks, and Sprinkmann was hired as the insulation contractor to perform the insulation work. As to Pabst, Wolter testified that Ahnert worked alongside him on tank transfers from Schlitz to Pabst. Ahnert's duties were to disconnect and reconnect tank piping, and Ahnert did not wear a mask. Richard Handlos, another steamfitter who worked at Pabst during the relevant time period, testified that it was "mostly Sprinkmann" that removed the insulation. Daniel Tischer, who worked with Pabst from 1963 to 1993, testified that from approximately 1964, Sprinkmann was on site to replace the wrap on the pipes. Finally, a Sprinkmann deliveryman testified that Sprinkmann employees did insulation work at all of the Pabst buildings between 1955 and 1972. Hence, the court concludes that there is sufficient evidence that Ahnert performed work involving asbestos, that the asbestos was bought or probably bought/supplied by Sprinkmann, and that Ahnert worked with or was exposed to the asbestos in his work. Summary judgment will be denied on this issue.

Next, Sprinkmann moves for summary judgment under Wisconsin's statute of repose. Plaintiff responds that the materials were defective before being furnished for construction, that the maintenance or repair work was not an improvement, and that she is entitled to a constitutional remedy.

Wisconsin Statute § 893.89 precludes claims for injury brought more than ten years after the date of substantial completion of an improvement to property. *Kohn v. Darlington Comm. Sch.*, 2005 WI 99, ¶¶ 13–15, 283 Wis.2d 1, 698 N.W.2d 794. Because it is a statute of repose, it "provides that a cause of action must be commenced within a specified amount of time after the defendant's action which allegedly led to injury, regardless of whether the plaintiff has discovered the injury or wrongdoing." *Mair v. Trollhaugen Ski Resort*, 2006 WI 61, 291 Wis.2d 132, 150, 715 N.W.2d 598, 607 (quoting *Tomczak v. Bailey*, 218 Wis.2d 245, 252, 578 N.W.2d 166 (1998)). In determining whether something qualifies as an improvement to real property the court applies the following test: "A permanent addition to or betterment of real property that enhances the capital value, involves the expenditure of labor and money, and is designed to make the property more useful and valuable." *(Id.*, ¶ 17.) On the other hand, there is an exception for claims brought against "[a]n owner or occupier of real property for damages resulting from negligence in the maintenance, operation or inspection of an improvement to real property." Wis. Stat. § 893.89(4)(c).

Plaintiff's brief in opposition to summary judgment argues that there is a genuine issue of material fact as to whether Ahnert's exposures during outages at the Oak Creek and Port Washington Power Plants and on the Pabst site were for maintenance or repair

13

work rather than an improvement to real property. Taken in the light most favorable to the nonmoving party, the evidence suggests that all of the work involving Sprinkmann involved existing mechanical systems. The purpose of the statute of repose is to protect contractors who are involved in permanent improvements to real property. *Peter v. Sprinkmann Sons Corp.*, 2015 WI App 17, ¶ 23, 360 Wis. 2d 411, 860 N.W.2d 308. The legislature has chosen to protect persons or entities which make permanent improvements to real property, not to absolve those who make regular repairs or do maintenance work. *Id.* This distinction is reasonable because improvements to real property have a completion date whereas regular repairs and maintenance can continue ad infinitum. *Id.* (citing *Kohn*, 283 Wis.2d 1, ¶ 71, 698 N.W.2d 794). Indeed, the testimony suggests that Sprinkmann did all of the insulation work at the Pabst buildings between 1955 and 1972.

Admittedly, it is difficult for Sprinkmann to respond to summary judgment with evidence regarding specific projects because plaintiff has identified various time periods during which Ahnert was on site rather than particular projects. However, to the extent that there is any evidence regarding turbine outages, the evidence with respect to this defendant suggests that the workers were tearing down and rebuilding rather than removing or installing new systems. Moreover, the evidence regarding Pabst suggests that Sprinkmann employees were on site five days a week for repair and recovering of the pipes—work done to keep the pipes in proper condition. *See Hocking v. City of Dodgeville*, 2010 WI 59, ¶ 48, 326 Wis.2d 155, 785 N.W.2d 398 (defining "maintenance" as "[t]he work of keeping something in proper condition; upkeep") (quotation marks and citation omitted). Hence, on this record, the court cannot definitively say that Sprinkmann's work constituted an improvement rather than repair or maintenance. Because the purpose of the statute

14

of repose is to protect contractors who are involved in permanent improvements to real property, the statute of repose does not apply to bar Ahnert's action.[4]

As a final matter, plaintiff has asserted a claim for punitive damages. In Wisconsin, the plaintiff may receive punitive damages if evidence is submitted that the defendant acted maliciously or in an intentional disregard of the plaintiff's rights. Wis. Stat. § 895.043. The statute "heightened the state of mind required of a defendant from a 'wanton, willful and reckless' disregard for rights of another to an 'intentional disregard' for rights of another." *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 63, 312 Wis. 2d 251, 752 N.W.2d 800 (2008) (citing *Strenke v. Hogner*, 2005 WI 25, ¶ 19, 279 Wis. 2d 52, 694 N.W.2d 296 (2005)). To warrant imposition of punitive damages, defendants' conduct must have been deliberate and malicious. *Henrikson v. Strapon*, 2008 WI App 145, ¶¶ 14–16, 314 Wis.2d 225, 758 N.W.2d 205 (2008). Punitive damages cannot be awarded for conduct that did not cause the injury. *Henrikson*, 2008 WI App 145, ¶ 19 (citing *Kehl v. Economy Fire & Cas. Co.*, 147 Wis.2d 531, 433 N.W.2d 279, 280 (Wis. Ct. App. 988) ("Juries are not given license to roam the caverns of their consciences to punish conduct they deem despicable unless a plaintiff can prove that he or she has suffered some actual damage as a result of the conduct.")).

On summary judgment, the court is called upon to determine whether questions of fact exist. Plaintiff has created a genuine issue of material fact regarding notice of the asbestos-related dangers inasmuch as Sprinkmann's owner and son died of mesothelioma

---

[4]The court rejects plaintiff's argument that Wis. Stat. § 893.89 is unconstitutional as applied if held to bar the claims for asbestos related conditions diagnosed after April 29, 1994, for the same reasons that the Wisconsin Supreme Court rejected this argument in *Kohn v. Darlington Community Schools, EMC, et al.,* 2005 WI 122, 698 N.W.2d 794 (2005).

15

by the late 1960s, Sprinkmann had access to literature identifying asbestos as a toxic substance, a 1964 study regarding the health effects of asbestos was distributed to members of Insulators Local 19 (which included Sprinkmann employees), and Sprinkmann employees began filing workmen compensation claims for asbestos-related diseases beginning in 1956. Nevertheless, any ruling on this issue appears to be premature in light of the prior request for consolidation that may be renewed before Judge Pepper. The punitive damages issue in the lower case number was severed by Judge Robreno in the MDL and was not transferred to this district. Therefore, to the extent that the claims may be decided in a single action, the presiding judge will have to determine how to proceed with the issue. Now, therefore,

IT IS ORDERED that Sprinkmann Sons Corporation and Employers Insurance Company of Wausau's motion for summary judgment is denied.

Dated at Milwaukee, Wisconsin, this 6th day of January, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE