UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BEVERLY AHNERT Individually and as Executrix
of the Estate of Daniel Ahnert, Deceased,

        Plaintiff,

    v.                              Case No.  13-C-1456

EMPLOYERS INSURANCE COMPANY OF WAUSAU,
PABST BREWING COMPANY,
SPRINKMANN SONS CORPORATION,
WISCONSIN ELECTRIC POWER COMPANY,

        Defendants.

---

ORDER DENYING WISCONSIN ELECTRIC POWER COMPANY'S
MOTION FOR SUMMARY JUDGMENT (DOC. 123)

The December 30, 2013, complaint in this action alleges that "from approximately 1955 to 1980" the decedent Daniel Ahnert was "exposed to asbestos products and inhaled airborne asbestos fibers released while using or working in proximity to others using or removing such products." (Doc. 1, ¶ 21.) Ahnert died in 2011 from mesothelioma. His wife, Beverly Ahnert (hereinafter "plaintiff"), sued Wisconsin Electric Power Company (WEPCO), as a premise owner, asserting negligence and punitive damages claims. Notably, this is the third time that plaintiff has sued WEPCO based on Daniel Ahnert's alleged exposure to asbestos-containing products at a WEPCO facility. The first case remains pending in the Eastern District of Wisconsin; the second, which was filed in Milwaukee County Circuit Court, was dismissed without prejudice. Over time, plaintiff's theories of exposure to asbestos have evolved from an exposure in the 1980s at a WEPCO facility to multiple additional exposures in the 1960s at the Oak Creek and Port Washington Power Plants.

Ruling on the pending motion requires discussion of prior litigation because the allegations involve the same actors, and overlapping claims of exposures, and injury. Daniel Ahnert first filed suit in the Eastern District of Wisconsin on February 25, 2010, naming WEPCO and seventeen other defendants on claims that he "inhaled airborne asbestos fibers" resulting in "asbestos disease and injury." (Case No. 10-C-156, Doc. 1.) That case was transferred to MDL-875 in the Eastern District of Pennsylvania.

On January 10, 2011, Ahnert filed a second suit in Milwaukee County Circuit Court based on a new mesothelioma diagnosis, again naming WEPCO as a defendant. *Daniel Ahnert et al. v. Allied Insulation Supply Co., Inc., et al.*, Case No. 2011CV551. Ahnert died on July 7, 2011, and his wife, Beverly Ahnert, was appointed executrix of the estate. Beverly Ahnert decided to dismiss the Milwaukee County Circuit Court case on December 20, 2011; however, she waited until May 2, 2014, to file a motion for leave to amend her MDL complaint to add the mesothelioma claim. The MDL court denied her request on May 22, 2014, on the ground that she had waited three years to move to amend the complaint and did so after discovery had closed and summary judgment motions were briefed. (Case No. 10-CV-67443 (E.D. Pa.), Doc. 406.) In ruling on WEPCO's summary judgment motion on August 4, 2014, Judge Eduardo C. Robreno of the MDL decided to remand the negligence and construction statute of repose issues arising under Wisconsin law. With respect to the punitive damages claim, Judge Robreno determined that the issue must be resolved at a future date with regard to the entire MDL-875 action and, therefore, severed any claim from the case that was returned to the Eastern District of Wisconsin. (Case No. 10-CV-67443 (E.D. Pa.), Doc. 412.) The case was returned to this district on September

2

8, 2014, where it is pending before Judge Pamela Pepper with similar summary judgment motions filed by Sprinkmann Sons, Pabst Brewing, WEPCO, and Foster Wheeler.

Meanwhile, on December 30, 2013, plaintiff filed her third lawsuit in this district, naming many of the same defendants. Again she contends that Daniel Ahnert "suffered from asbestos related diseases . . . including without limitation asbestosis." However, plaintiff now includes the malignant mesothelioma diagnosis from January 4, 2011. (Doc. 1 at 23.)

On November 9, 2015, this court heard oral argument on the six summary judgment motions pending before this court. The parties were advised to respond candidly and completely about arguments that were made before the various courts and the dates on which discovery was requested and/or responses filed. Much of the five-hour hearing focused on evidence that plaintiff first produced in opposition to summary judgment and/or after discovery closed. The court excluded the June 17, 2015, declaration of Jon Shorougian, and ordered plaintiff to disclose all social security records. In turn, plaintiff agreed to redact the name of Foster Wheeler from the records disclosed after the discovery period, and stipulated to the dismissal of L&S insulation Company Inc. and Building Services Industrial Supply, Inc. The court continued the hearing on December 10, 2015. The court has since granted Foster Wheeler's summary judgment motion.

For the reasons set forth below, WEPCO's summary judgment motion will be denied and the parties will proceed to trial.

LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

3

Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## FINDINGS OF FACT

Daniel Ahnert worked as a pipefitter or steamfitter from 1955 through 1992 out of Milwaukee Union Local 601. (Pl.'s Ex. 1; Rhoades Aff., Ex. B at 10-11.) Dr. Stephen Haber diagnosed Ahnert with asbestos-related pleural disease and attributed this condition to each of Ahnert's exposures to asbestos. (Pl.'s Ex. 2 at 6.) Ahnert was diagnosed with malignant mesothelioma in late December of 2010 or January 4, 2011. (Pl.'s Ex. 2 at 6; Compl. ¶ 23.) After Ahnert passed away on July 7, 2011, his wife, Beverly Ahnert, was the duly appointed executrix of his estate. (Compl. ¶ 2.) Daniel Ahnert's death certificate lists malignant mesothelioma as the cause of his death. (Pl.'s Ex. 3.)

In her complaint, plaintiff alleges that WEPCO "is the owner or operator, or is responsible for the conduct of a previous owner or operator of premises where asbestos products were used." (Compl. ¶ 16). She further contends that Ahnert, from approximately 1955 to 1980, was exposed to and inhaled airborne asbestos fibers released while using or working in proximity to others using or removing such products and suffered from asbestos related diseases, including without limitation malignant mesothelioma diagnosed

4

on January 4, 2011, and non-malignant asbestos conditions, including without limitation asbestosis. (Compl. ¶¶ 21, 23). According to plaintiff, the exposures occurred at three WEPCO facilities—Oak Creek, Port Washington, and Lakeside. (Compl. ¶¶ 47-62 and Pl.'s Ex. B.)

Charles Lewitzke worked with Ahnert on an outage at Oak Creek Power House between 1968 and 1969 for at least four months.[1] (Pl.'s Ex. 4 at 11-14.) After the Oak Creek outage, Lewitzke was trained to identify insulation that contained asbestos. He relied on his training in assessing whether the insulation he remembered at Oak Creek contained asbestos. (Pl.'s Ex. 4 at 35-36.) According to Lewitzke, Ahnert's duties on the Oak Creek outage included covering pipes and some of the duties were performed on the turbine floor. (Pl.'s Ex. 4 at 15.) Ahnert stood approximately 20 feet from workers who were removing and installing insulation. (Pl.'s Ex. 4 at 17-18.) However, Lewitzke could not recall the brand names of insulation products. (Rhoades Aff., Ex. E at 64, 68-90.)

The Oak Creek outage was an overhaul of a General Electric fossil fuel turbine, which required removal and reinstallation of insulation, including asbestos blankets, asbestos sheets, and asbestos pipecovering. (Pl.'s Ex. 4 at 14, 17-18, 20.) Insulation packages at the Oak Creek outage were labeled with the word "asbestos" and the foreman and other workers used the word "asbestos" to describe the insulation. (Pl.'s Ex. 4 at 19-21.) The Oak Creek outage including all insulation work, was conducted in a manner

---

[1]WEPCO asks the court to disregard Lewitzke's testimony based on the court's February 3, 2015, ruling and plaintiff's inability to establish that Lewitzke was unavailable during the discovery period in the MDL. (Doc. 110 at 8.) However, the court's ruling was based on the judgment entered dismissing plaintiff's claims against various co-defendants in the MDL. No judgment has been entered with respect to plaintiff's claims against WEPCO regarding asbestos exposure. The court finds no basis to invoke the doctrine of preclusion in this case. Further, WEPCO did not dispute the plaintiff's statement during the December 10, 2015, hearing that Lewitzke was timely disclosed as a witness on June 30, 2014.

5

common for similar work during this period of time.  (Pl.'s Ex. 4 at 19-23.)   Insulation work created large quantities of dust for the entirety of the Oak Creek outage.[2]  (Pl.'s Ex. 4 at 17-19; Pl.'s Ex. 5, ¶ 11.)  There were no safety procedures, such as masks or instruction, to protect workers on the turbine job from the dangers of inhaling asbestos.  (Pl.'s Ex. 4 at 19, 21-22.)  Indeed, during the turbine outages, WEPCO, through its maintenance supervisors and engineers,  was responsible for overseeing the removal and installation of insulation. (Pl.'s Ex. 5, ¶ 8.)

In addition, Lewitzke worked with Ahnert at the Port Washington Power House, a WEPCO facility, on a turbine outage that lasted six-to-eight months between 1964 and 1965.  (Pl.'s Ex. 4 at 24, 27-28, 31.)  The purpose of the Port Washington outage was to remove a damaged spindle fiber and replace it upon repair.  (Pl.'s Ex. 4 at 27.)  On the Port Washington outage, many types of insulation, including asbestos sheets, asbestos cement, and pipe covering, were removed and reinstalled.  (Pl.'s Ex. 4 at 28-29, 33-35.)  Labels of some insulation packages at the Port Washington outage included the word "asbestos." (Pl.'s Ex. 4 at 35.)   The removal and reinstallation of turbine insulation on the Port Washington outage produced large quantities of dust.  (Pl.'s Ex. 4 at 32; Ex. 5 , ¶ 1.)  On the Port Washington outage, there were no safety precautions in place, such as wearing masks, to protect workers from the dangers of inhaling asbestos fibers.  (Pl.'s Ex. 4 at 32-33, 36.)  WEPCO, through its maintenance supervisors and engineers, took responsibility

---

[2]WEPCO objects to the proposed finding on the ground that plaintiff has not established that the testimony was unavailable during the discovery period in the MDL.  However, plaintiff disclosed James Herian as a witness in the Rule 26(a)(1) disclosure made on June 30, 2014.  WEPCO does not allege that the affidavit contradicts earlier testimony or that Herian failed to respond to a notice of deposition.

6

for removing and installing insulation on turbine outages, including the Port Washington outage. (Pl.'s Ex. 5, ¶ 8.)

Before OSHA regulations were enacted in 1972, insulation installed on boilers, turbines, and other equipment contained 10-15% asbestos. (Pl.'s Ex. 7 at 15-17; Pl.'s Ex. 6 at 5141-5162.) Between the 1940s and 1980s, gaskets installed in industrial settings contained 50-80% asbestos. (Pl.'s Ex. 7 at 21-22.) Sheet packing contained 30-50% asbestos. (Pl.'s Ex. 7 at 25.) Rope yarn packings contained 75-100% asbestos. (Pl.'s Ex. 7 at 25.) Before the 1972 OSHA regulations, insulation materials on high-heat sections of turbine always contained asbestos. (Pl.'s Ex. 5 at 3, 5, 7; Pl.'s Ex. 9 at 9, 16.) Less than 1% of the total pipecovering was removed during any single outage of a unit at the Oak Creek Power Plant. (Pl.'s Ex. 8, ¶ 9.)

In the 1980s, John Shorougian worked with Ahnert as his partner on the boiler in Unit 5 of the Oak Creek Power House for approximately six months.[3] (Pl.'s Ex. 10 at 5-7.) On November 29, 1988, WEPCO and Babcock & Wilcox entered a contract that provided:

---

[3]Plaintiff also cites the Declaration of Jon Shorougian, which was filed in opposition to summary judgment and which contradicts earlier deposition testimony. During the oral argument on November 9, 2015, this court struck the Declaration as a sham affidavit. The Shorougian declaration dated June 17, 2015, was first disclosed on June 29, 2015, in response to the summary judgment motions. Shorougian was deposed on March 27, 2012, plaintiff was required to amend her pleadings by July 15, 2014, and discovery closed on February 27, 2015. Although plaintiff maintains the declaration was simply an attempt to "correct and clarify" statements made during the deposition, Shorougian contradicts prior deposition testimony. Shorougian's declaration changes the date of last asbestos exposure from 1980 to 1989, changes the employer from Foster Wheeler to Babcock & Wilcox, and changes the time period during which Shorougian worked with Ahnert from "early 1980s" to 1989. During oral argument, plaintiff conceded that, by December 4, 2012 (at the very latest), plaintiff knew of a document in Beverly Ahnert's possession that contradicted the dates mentioned by Shorougian in his deposition and that there was evidence that the plaintiff would rely upon in support of her claim of exposure at the Oak Creek Power Plant. By choosing not to disclose the Shorougian declaration until after discovery had closed, plaintiff deprived defendants of the opportunity to challenge Shorougian's recollection and candor with respect to the affidavit and/or his earlier deposition testimony. Moreover, defendants made specific requests through interrogatories regarding the nature of plaintiff's claim but plaintiff only produced the Shorougian deposition. For these reasons, the court excluded the Shorougian declaration as a sham.

> Where, in the opinion of the Company [WEPCO], additional measures are necessary to provide safe and healthful working conditions, such measures shall be adopted, followed, and maintained by the Contractor at his own expense.

(Pl.'s Ex. 19, ¶ 16 at 17.) The project administrator had the right to suspend work at any time. (Def.'s Ex. F.) Shorougian testified in his deposition that the boiler was about 100 feet high, and roughly 50x50 feet across. (Pl.'s Ex. 10 at 6-7.) WEPCO employees identified the areas containing asbestos for purposes of advising contractors not to work in such areas and on such materials until the asbestos had been removed by proper safety measures. (Pl.'s Ex. 12 at 34-35.)

The partial burner replacement took place several years after the enactment of OSHA regulations, contained in the Federal Register, Vol. 7, No. 110 (June 7, 1972), on workplace safety that included requirements on when to label asbestos-containing materials and when the label is not required. (Pl.'s Ex. 13 at 11321.) Shorougian testified that, during the burner deck replacement, the WEPCO engineer worked closely with Shorougian and Ahnert's foreman and with the other men who were working in the project. (Pl.'s Ex. 10 at 34-35.) He further testified that WEPCO told him the insulation was not asbestos. (Pl.'s Ex. 10 at 9.) However, the contract terms state that WEPCO turned over all responsibility for the work to remove the asbestos insulation on the burner deck of Boiler Unit No. 5. (Paulsen Aff., ¶ 12.)

While working on the burner deck replacement, Ahnert cut, ground, and welded pipes; he also removed insulation from the burner deck and placed it into garbage bags. (Pl.'s Ex. 10 at 7, 8, 11, 13, 63-64, 70.) Workers removing insulation on the burner deck wondered whether it contained asbestos and within 2-3 days after commencing the job, the

workers had insulation samples tested by the union. (Pl.'s Ex. 10 at 12-13.) When sections of the burner deck were removed, large quantities of dust were released into the surrounding air. (Pl.'s Ex. 10 at 11.) Ahnert cleaned residual insulation from areas that were difficult to reach. (Pl.'s Ex. 10 at 63.) Dust created through insulation removal settled in the area where Ahnert was working and was frequently stirred up. (Pl.'s Ex. 10 at 19, 76.)

During that time, Ahnert removed 16 gaskets, eight by eight inches in size, from the Foster Wheeler boiler and cleaned them with a scraper or power grinder, which took about an hour for each gasket. (Pl.'s Ex. 10 at 14-15, 74.) Ahnert's nose was six-to-eight inches from the gaskets that he removed, causing him to inhale dust coming from the gaskets. (Pl.'s Ex. 10 at 75.) Most of the gaskets that Ahnert removed were manufactured by Garlock before 1972 and contained asbestos. (Pl.'s Ex. 12 at 41.) Dennis Zielinski, another member of Steamfitters 601, was on site at the same time and recalled that the gaskets installed before 1972 were Garlock and contained asbestos. (Pl.'s Ex. 12 at 41-42.)

Sol Burnstein, the former vice-chairman and chief of power plants for WEPCO, described the responsibility of WEPCO employees for safety at their power plants:

> All of the operating and maintenance people, all of our employees – I say "our" in those days – had a responsibility for ensuring a safe workplace. It was part and parcel of our – of our assignment, our work; and I think they would have identified an unsafe practice or environment if they found one.

(WEPCO MDL brief at Ex. P38 at 55.) WEPCO considered its medical department to be responsible for "taking care of employees." (Pl.'s Ex. 64 at 12.) WEPCO's health and safety department was responsible for setting up procedures to protect employees from occupational exposures. (Pl.'s Ex. 64 at 12; Pl.'s Ex. 63 at 12-13.)

9

In the early 1930s and early 1940s, medical researchers published articles on diseases contracted by workers exposed to asbestos, including asbestosis and asbestos-related cancer. (Pl.'s Ex. 23 at 9-11, ¶¶ 55-69.) Dr. Henry Anderson, Chief Medical Officer for Occupational and Environmental Health and State Occupational and Environmental Epidemiologist with the Wisconsin Division of Public Health, opined that "by the decades of the 1930s and 1940s it was known or could have been known by the medical community, industry management, workers' compensation insurers and occupational regulatory authorities that asbestos dust inhalation posed a significant human health hazard and that asbestos fibers penetrated deep into the lungs where they persisted, could not be removed, led to irreversible and progressive tissue damage which caused diseases which were incurable and could lead to disability and death." (Pl.'s Ex. 23 at ¶ 124.) In his affidavit, Dr. Anderson further opined:

> Even before the full extent of the health hazard impact is known (how many of the exposed are ill, with what diseases and at what exposure levels) preventive, health protective actions such as dust suppression, consideration of material substitution, warnings, safety instructions to current workers and respiratory protection should be initiated by industry to reduce exposures and the subsequent risk of disease pending the outcome of comprehensive in-depth investigations the results of which may take time to develop.

(Pl.'s Ex. 23 at 3, ¶ 15.) The Wisconsin Industrial Commission recognized in its regulations that measures to protect workers from inhaling damaging dusts were available and important. (Pl.'s Ex. 24 at 14 [Wis. Adm. Code Ind. 12.2006], 15 [Wis. Adm. Code Ind. 12.2012].)

Roy Selbo, who worked in WEPCO's safety department, knew that there was asbestos being used in the WEPCO power plants. (Pl.'s Ex. 63 at 16-17.) The executive in charge of WEPCO's power plants, Sol Burstein, knew in the 1960s that the normal usage

10

of insulation on equipment at WEPCO's power plants created visible airborne asbestos dust.  (Pl.'s Ex. 65 at 28-29.)  Further, in a 1947 general safety order applicable to all "places of employment," the Wisconsin Industrial Commission declared that asbestos was a "harmful" mineral dust.  (Pl.'s Ex. 66 at 1, 4; Pl.'s Ex. 23 at 17-18, ¶ 108.)  Burstein testified that he was not "specifically" familiar with any procedures that WEPCO put into place about precautionary measures when working around airborne asbestos.  (Pl.'s Ex. 65 at 58.)

Before the 1980s, WEPCO failed to monitor air inside its facilities for the presence of asbestos.  (Pl.'s Ex. 62 at 46-48; Pl.'s Ex. 65 at 51-52.)  Further, before this time WEPCO failed to suppress the creation of dust on its premises, substitute asbestos-containing insulation with nontoxic alternatives, or warn its employees about the dangers of inhaling asbestos.  (Pl.'s Ex. 65 at 58; Pl.'s Ex. 51 at WE52291-WE52292; Pl.'s Ex. 52 at WE52240-WE52242; Pl.'s Ex. 53 at WE52214-WE52216; Pl.'s Ex. 18.)  Plaintiff's evidence suggests that before the 1980s, WEPCO failed to instruct workers on its premises about how to protect themselves from inhaling asbestos and failed to implement measures that would protect workers on its premises from the dangers of inhaling asbestos.  (Pl.'s Ex. 62 at 47-48; Pl.'s Ex. 55 at 63, 65, 66, 240; Pl.'s Ex. 65 at 58.)  As a final matter, one of plaintiff's experts opined that the normal process for handling, installing, removing and repairing asbestos insulation produces airborne fibers.  (Pl.'s Ex. 7.)

For purposes of summary judgment, plaintiff has maintained that Babcock & Wilcox employed Daniel Ahnert in 1989 for the purpose of working on the Unit 5 boiler.  (Def.'s PFOF 13.)  In 1989, WEPCO contracted with and relied upon Babcock & Wilcox to complete various projects.  (Rhoades Aff., Ex. F, ¶¶ 8-14.)  Babcock & Wilcox was

11

contractually required to remove all asbestos-containing insulation by January 23, 1989, and complete the demolition phase by February 22, 1989. (Rhoades Aff., Ex. F.) The contract with WEPCO allowed Babcock & Wilcox to hire subcontractors to conduct the asbestos remediation, which was required to be completed in the demolition phase by January 23, 1989. (Rhoades Aff., Ex. F, ¶ 8.) Pursuant to the contract, the subcontractors were also required to adhere to the terms of WEPCO's contract. (*Id*.) Babcock & Wilcox signed the contract that set forth the scope of work and safety requirements by which its employees and subcontractors had to abide. (Rhoades Aff., Ex. F, ¶¶ 6-13.) The contract provided that the only areas within the specification known to be "asbestos-free" were to the rear wall radiant super heater (elevation 45 and lower), south side wall radiant reheater (elevation 82 to elevation 30), and north side wall radiant reheater (entire wall). (Rhoades Aff., Ex. F, ¶ 6.)

> Specifically, the contract provided:
>
> All of the insulation within the 10 inch high space between the burner deck and the roof of the secondary air duct shall be removed and scrapped by the Contractor. It should be noted that in the past this area has been filled with a variety of insulation materials, from poured to block, and in varying thicknesses, leaving a patchwork of materials. All of the insulation shall be considered to contain "asbestos", and shall be appropriately handled/ disposed by the Contractor.

(See Rhoades Aff., Ex. Fm ¶ 6, Ex. A at 5.11.2.3.) Additionally, the contract required Babcock & Wilcox to comply with all pertinent state and federal safety regulations; wear respiratory protection based upon OSHA requirements; employ all necessary materials and safeguards, and work so as to ensure all personnel in direct and adjacent work areas were protected from exposure to airborne asbestos. (Rhoades Aff., Ex. F, ¶¶ 6-11, Ex. A at 2-4, 2-8.) Rather than stopping work when they may have come in contact with asbestos-

12

containing materials, Ahnert's co-workers took a sample of the material and gave it to a union representative for testing and continued working.  (Rhoades Aff., Ex. C at 12, 50.) Lewitzke testified that Ahnert installed insulation on turbine piping at OCPP and Port Washington during unit shutdowns.  (Rhoades Aff., Ex. E at  27-29, 43-44.)

CONCLUSIONS OF LAW

WEPCO has moved for summary judgment on the plaintiff's safe place claim, while also asserting that it cannot be liable for injuries sustained by employees of independent contractors.  Additionally, WEPCO asserts that plaintiff's claims are barred by Wisconsin's construction statute of repose.  Finally, WEPCO moves to dismiss the punitive damages claim because there is no evidence that WEPCO engaged in any malicious conduct or acted with intentional disregard to Ahnert's rights.

As in an initial matter, plaintiff asserts negligence in count III of the complaint against Pabst Brewing Company and Wisconsin Electric Power Company.  Specifically, paragraph 53 of the complaint alleges that WEPCO, as an employer or an owner, owed a duty to frequenters to provide a safe place as set forth under the common law and codified in Wis. Stat. § 101.11.  (Doc. 1.)

Wisconsin's  safe place statute, Wis. Stat. § 101.11(1), is a negligence statute that does not create a new cause of action but rather establishes a high standard of care greater  than that of ordinary care imposed at common law.  *Barry v. Employers Mut. Cas. Co.,* 2001 WI 101, ¶ 18, 245 Wis. 2d 560, 630 N.W.2d 517.  Whereas ordinary negligence pertains to acts, the safe place statute pertains to unsafe conditions.  *Szalacinski v. Campbell*, 2008 WI App 150, ¶ 25, 314 Wis. 2d 286, 760 N.W.2d 420.  Specifically, the safe place statute requires that "[e]very employer and every owner of a place of

13

employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe." Wis. Stat. § 101.11(1). Under the safe place statute, if an alleged defect is attributable to the failure to safely repair or maintain, the law requires proof of actual or constructive notice; in contrast, if an alleged defect is attributable to a defect in the original structural design or construction, an owner or employer is liable regardless of whether he or she knew or should have known of the defect. *See Barry*, 2001 WI 101, ¶¶ 22-23.

WEPCO maintains that it cannot be liable to the plaintiff because it did not supervise or control Ahnert's work. The safe place statute requires that a building owner must have the right of supervision or control. *Hortman v. Becker Constr. Co. Inc.*, 92 Wis. 2d 210, 226, 284 N.W.2d 621 (1979). Further, WEPCO believes it had no duty to protect Ahnert from unsafe acts or activities on the premises. For example, Shorougian testified that the employees did not adhere to the contract terms regarding safety and asbestos. In addition, Lewitzke testified that Ahnert's exposure occurred as the result of installing insulation on turbine piping during the Oak Creek and Port Washington unit shutdowns. Without evidence of unsafe conditions at the premises or a failure to repair or maintain, the exposure is the result of "acts of operation" conducted on WEPCO's premises and WEPCO has no affirmative duty to protect Ahnert from the activities of his own employer and subcontractors.

There is a genuine issue of material fact as to whether WEPCO exercised supervision or control over Ahnert. WEPCO focuses on the 1989 exposure because that was the exposure initially plead in Ahnert's prior litigation. However, plaintiff has produced evidence of additional exposures at WEPCO facilities in the 1960s. That evidence is

14

admissible notwithstanding plaintiff's failure to rely upon it in other litigation. While WEPCO produced the Babcock & Wilcox contract from 1989, there are no contracts in the record from the 1960s. On the other hand, James Herian, who worked on WEPCO's maintenance crew from 1951 to the 1980s, averred that "during original insulation and during turbine outage work, WEPCO staff always supervised the insulation application and tear-out of insulation." Herian knew personally "almost all the WEPCO maintenance supervisors and engineers who were responsible for proper completion of the outage work" and "recognized them as WEPCO staff because of insignias on hardhats and work clothes." Also, Lewitzke testified that there were no safety procedures such as masks or instruction to protect workers on the turbine job from the dangers of inhaling asbestos. With respect to the Oak Creek Power Plant work in the 1980s, Shorougian testified that WEPCO told them it was safe to remove the insulation. Significantly, WEPCO argued in its reply brief that only Shorougian's testimony should be considered. However, at this stage, it is for a jury to weigh the testimony and resolve any conflicts in the evidence.

Along the same lines, plaintiff produced evidence that WEPCO was aware that normal usage of insulation on equipment at WEPCO's power plants created visible airborne asbestos dust and the manager of operations for the power plants could not recall any safety measures in place to protect workers from the dangers of asbestos exposures. Further, there is evidence that prior to the 1980s, WEPCO mandated the use of asbestos-containing materials on its structures and did not take steps to suppress the creation of dust on the premises notwithstanding literature warning of asbestos dust.

At trial, WEPCO may be able to present evidence regarding the relinquishment of supervision or control, actions taken or not taken by its contractor, and or actions it took to

15

otherwise fulfill its duty under the safe place statute. Hence, a jury must decide whether there was an unsafe condition at WEPCO caused by the airborne asbestos after it was disturbed during the outage work.

The court is not ruling, as a matter of law, that the airborne asbestos was an unsafe condition. Rather, it is following a line of cases suggesting it may be an unsafe condition and there is evidence in this record supporting such a theory. This district's Chief Judge, William C. Griesbach, held the release of asbestos dust into the air during regularly-conducted repair work of a paper mill could constitute a defect or unsafe condition for which the premise owner had notice. *See Anderson v. Proctor & Gamble Paper Prods. Co.*, 924 F. Supp. 2d 996, 1001–03 (E.D. Wis. 2013). In *Anderson*, the electrician had to cut through asbestos insulation and "often worked in close proximity to pipefitters, pipe insulators, and other . . . employees who were replacing steam pipe insulation, performing repairs, or cleaning up insulation and debris simultaneously." *Id.* at 1000. Similarly, in *Calewarts v. CR Meyer and Sons Co.*, the Wisconsin Court of Appeals held that the release of asbestos dust into the air during regularly-conducted repair of steam pipes created an "unsafe condition" within the meaning of Wis. Stat. § 101.11. *See Calewarts,* 2011AP1414, unpublished slip op., ¶¶ 6–8, 24, 45, 2012 WL 2546946 (Wis. Ct. App. July 3, 2012).

In another Wisconsin case, WEPCO maintained that the presence of asbestos was not an unsafe condition and that it was caused by the plaintiff's negligent act of operation. *Viola v. Wisconsin Elec. Power Co.*, 2014 WI App 5, ¶ 22, 352 Wis. 2d 541, 842 N.W.2d 515. The crux of WEPCO's argument was that plaintiff performed the work that released the asbestos dust in the air, thereby precluding him from recovering any damages. The Wisconsin Court of Appeals rejected the argument because the record suggested that the

16

asbestos was necessarily disturbed as part of the maintenance and/or repair work required at the premises. 2014 WI App 5, ¶ 24. In finding a genuine issue of material fact, the Court of Appeals noted:

> [A]s a result of the installation, repair, and removal of asbestos-containing products, he was in constant contact with asbestos dust while working in Wisconsin Electric's buildings; Wisconsin Electric either knew or should have known not only that individuals working in its buildings were continually exposed to asbestos, but also that this exposure was harmful; Wisconsin Electric did nothing to alleviate the dangers of asbestos exposure; and Viola's exposure to asbestos caused his death. Wisconsin Electric, choosing to focus solely on Viola's amended complaint, did not dispute that this evidence creates material issues of fact.

2014 WI App 5, ¶ 26.

Further, this court rejects WEPCO's attempts to escape liability simply because it hired a contractor which it claims was working independently on the Oak Creek Power Plant outage in the 1989. The safe place statute applies to persons who frequent premises, and broadly defines a frequenter as "every person, other than an employee, who may go in or be in a place of employment or public building under circumstances which render such person other than a trespasser." Wis. Stat. § 101.01(6). WEPCO's duties, as a property owner, to a frequenter are non-delegable. *Barry*, 2001 WI 101, ¶ 42.

WEPCO relies upon its 1989 contract with Babcock & Wilcox to support its argument that it relinquished all supervision and control for the removal of asbestos-containing insulation and a requirement to assume that if insulation was found it should be treated as containing asbestos. However, as discussed above, there is a genuine issue of material fact as to whether WEPCO truly relinquished supervision and control at any point during the exposures at issue.

17

Having determined that plaintiff may proceed on her safe place claim, there is a question whether the 10-year construction statute of repose bars the claim inasmuch as this is an "action for injury resulting from improvements to real property." Wis. Stat. § 893.89. Section 893.89 of the Wisconsin Statutes constitutes a statute of repose in actions for injury resulting from improvements to real property. *Hocking v. City of Dodgeville*, 785 N.W.2d 398, 403, 326 Wis.2d 155, 166, 2010 WI 59, ¶ 19 (Wis. 2010). Wisconsin Stat. § 893.89(2) provides in relevant part:

> [N]o cause of action may accrue and no action may be commenced . . . against the owner or occupier of the property or against any person involved in the improvement to real property after the end of the exposure period . . . arising out of any deficiency or defect in the design, land surveying, planning, supervision or observation of construction of, the construction of, or the furnishing of materials for, the improvement to real property.

Subsection (1) defines the "exposure period"—the period of time in which a suit may be filed—as "10 years immediately following the date of substantial completion of the improvement to real property." Wis. Stat. § 893.89(1). In support of its argument, WEPCO asserts that it is the owner of the property where the injuries occurred, that all claims relate to work conducting an improvement to real property, plaintiff's claims are outside of the exposure period, and no exceptions apply.

The Wisconsin Supreme Court has determined that the construction statute of repose only bars safe place claim arising from injuries caused by structural defects. *Mair v. Trollhaugen Ski Resort*, 2006 WI 61, 291 Wis. 2d 132, 715 N.W.2d 598 (2006). However, here plaintiff is proceeding on the theory that airborne asbestos fibers "released during normal handling, installing, removing, or clearing up asbestos" caused Ahnert's injuries. There is evidence in this record supporting plaintiff's claim that Ahnert's injury

18

occurred when asbestos was disturbed at WEPCO facilities rather than when the asbestos was initially installed.

The court also rejects WEPCO's argument that the record establishes, as a matter of law, that the work completed by Ahnert was an improvement rather than maintenance or repair. *See* Wis. Stat. § 893.89(2). The Wisconsin Supreme Court defines improvement, based on common usage and the dictionary definition, as follows: "[A] permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Kallas Millwork Corp. v. Square D Co.*, 66 Wis. 2d 382, 386, 225 N.W.2d 454 (1975).

WEPCO's 1989 contract with Babcock & Wilson, by itself, does not establish that all of the work completed during the 1960's and 1980's constituted an improvement to real property, as a matter of law. Plaintiff has proffered testimony that Ahnert's work included covering pipes and that he stood approximately 20 feet from workers who were removing and installing insulation. The work also entailed the removal and reinstallation of insulation, including asbestos blankets, asbestos sheets, and asbestos pipecovering. The undisputed evidence concerning the Port Washington outage was that it was intended to remove a damaged spindle fiber and replace it upon repair. In addition, there was testimony about the removal and reinstallation of turbine insulation. At trial, the evidence may establish that the work done during the outages resulted in a permanent addition or betterment to the property enhancing its capital value; however, that is an issue for the jury to decide.

The court notes that the Wisconsin Court of Appeals recently reversed and remanded a circuit court's grant of summary judgment in favor of Pabst Brewing Company,

19

Miller Brewing Company, WEPCO, and Sprinkmann Sons Corporation. *Brezonick v. A. W. Chesteron Co.*, 2015 WL 9283609 (Wis. Ct. App. Dec. 22, 2015). The Court of Appeals determined that the defendants failed in their burden in showing that all of the plaintiff's claims arose from work intended to make improvements to real property. *Id.*, ¶¶ 2, 28. With respect to WEPCO, the circuit court concluded that the work at the Oak Creek Power Plant and Valley Plant in the mid 1960s, 1980s, and 1997, involved new pipe installations, removing old pipes, and installing completely new lines. *Id.*, ¶ 28. The Court of Appeals disagreed, finding that there was evidence that the plaintiff worked for an independent contractor at the Oak Creek Power Plant "renewing steam piping, doing maintenance work on valves and so on." *Id.*, ¶ 30. A former coworker testified that plaintiff removed steam pipe, and removed old insulation. *Id.* Consequently, there was evidence that created an inference—in the light most favorable to the plaintiff—that some of the work at WEPCO may have been maintenance and repair. *Id.*, ¶¶ 30, 31.

As a final matter, plaintiff is seeking punitive damages. In Wisconsin, the plaintiff may receive punitive damages if there is evidence that the defendant acted maliciously or in an intentional disregard of the plaintiff's rights. Wis. Stat. § 895.043. The statute "heightened the state of mind required of a defendant from a 'wanton, willful and reckless' disregard for rights of another to an 'intentional disregard' for rights of another." *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 63, 312 Wis. 2d 251, 752 N.W.2d 800 (2008) (citing *Strenke v. Hogner*, 2005 WI 25, ¶ 19, 279 Wis. 2d 52, 694 N.W.2d 296 (2005)). To warrant imposition of punitive damages, defendants' conduct must have been deliberate and malicious. *Henrikson v. Strapon*, 2008 WI App 145, ¶¶ 14–16, 314 Wis.2d 225, 758 N.W.2d 205 (2008). Ultimately, a ruling on this issue is premature in light of the prior

request for consolidation that may be renewed before Judge Pepper. Moreover, the punitive damages issue in the lower case number was severed by Judge Robreno in the MDL and was not transferred to this district. Hence, to the extent that the claims may be decided in a single action, the presiding judge will have to determine how to proceed with the issue. Now, therefore,

IT IS ORDERED that WEPCO's motion for summary judgment is denied.

Dated at Milwaukee, Wisconsin, this 22nd day of January, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

21